

#7

B139

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA, ex rel.
MICHAEL WICKER,

        Plaintiff/Relator,

v.

MED HEALTH SERVICES MANAGEMENT,
L.P., d/b/a/ MED HEALTH SERVICES LAB

        Defendant.

_____ /

Case No.: 20-1175

TO BE FILED UNDER SEAL
PURSUANT TO § 3730(b)(2)

**FILED**

AUG 07 2020

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

## COMPLAINT

Plaintiff Michael Wicker (hereinafter "Relator"), by and through undersigned counsel, brings this False Claims Act Complaint, on behalf of the United States of America (hereinafter "United States"), against the Defendant, Med Health Services Management, L.P., d/b/a/ MHS Labs (hereinafter "MHS").

I.    JURISDICTION AND VENUE ................................................................................. 1

II.   NATURE OF THE ACTION ..................................................................................... 2

III.  THE PARTIES ........................................................................................................... 3

      A.   PLAINTIFF/RELATOR MICHAEL WICKER ............................................................... 3
      B.   DEFENDANT MHS .................................................................................................. 3

IV.   APPLICABLE LAW .................................................................................................. 3

      A.   THE FEDERAL FALSE CLAIMS ACT ....................................................................... 3

V.    BACKGROUND ......................................................................................................... 5

      A.   MEDICAID PROGRAM ............................................................................................ 5
      B.   MEDICARE PROGRAM BACKGROUND AND REQUIREMENTS ................................... 5
      C.   COVID-19 TESTING UNDER MEDICARE PART B ................................................... 6
      D.   CLINICAL LABORATORY IMPROVEMENT AMENDMENTS (CLIA) ........................... 7

VI.   FRAUD ALLEGATIONS BY RELATOR ............................................................... 8

      A.   SPECIMEN ACCEPTANCE WITHOUT TWO PATIENT IDENTIFIERS ............................ 9
      B.   DEFAULT CODING TO COVID-19 TESTING ......................................................... 11
      C.   FAILURE TO TRAIN AND DOCUMENT TRAINING ................................................... 12
      D.   FAILURE TO PROVIDE APPROPRIATE SUPERVISION .............................................. 13

VII.  CLAIMS ................................................................................................................... 14

      A.   SUBMISSION OF FALSE CLAIMS .......................................................................... 14
      B.   SCIENTER ............................................................................................................ 15
      C.   MATERIALITY ..................................................................................................... 16

VIII. RETALIATION ....................................................................................................... 17

CAUSES OF ACTION ..................................................................................................... 18

      (FALSE CLAIMS ACT: PRESENTATION OF FALSE CLAIMS) (31 U.S.C. § 3729 (A)(1)(A)) 18
      (FALSE CLAIMS ACT: MAKING AND USING FALSE RECORDS AND STATEMENTS TO GET
      FALSE CLAIMS PAID) (31 U.S.C. § 3729(A)(1)(B)) ...................................................... 19
      (FALSE CLAIMS ACT: CONSPIRACY TO SUBMIT FALSE CLAIMS) (31 U.S.C. §
      3729(A)(1)(C)) .............................................................................................................. 21
      (FALSE CLAIMS ACT: RETALIATION) (31 U.S.C. § 3730(H)) ........................................ 22

PRAYER FOR RELIEF .................................................................................................. 22

# I.    <u>JURISDICTION AND VENUE</u>

1.    This action arises under the laws of the United States of America to redress violations of the federal False Claims Act, 31 U.S.C. § 3729, et seq.

2.    The acts prescribed by the False Claims Act, 31 U.S.C. §3729, and complained of herein, occurred within the Western District of Pennsylvania.

3.    Subject-matter jurisdiction is conferred by 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331, 1345.

4.    This Court has personal jurisdiction over the Defendant because Defendant transacts business within the Western District of Pennsylvania.

5.    Venue is proper in the Western District of Pennsylvania pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §1391 because Defendant transacts business in this district and one or more of the actions prescribed by 31 U.S.C. §3732 occurred in this district.  At all times relevant to this complaint, Defendant regularly conducted substantial business within the district, maintained employees and offices in the district, and made significant sales in this district.

6.    The facts and circumstances alleged in this complaint have not been publically disclosed in a criminal, civil or administrative hearing, nor in any congressional, administrative or governmental accounting office report, hearing, audit investigation, or in any news media.

7.    The Realtor is an "original source" of the information upon which this complaint is based, as the term is used in the False Claims Act.  The False Claims Act, 31 U.S.C. §3729 (herein referred to as "FCA" or "The Act"), was originally enacted in 1863 and

subsequently amended thereafter to enhance and modernize the government's tools for recovering losses sustained by frauds against it after finding that federal program fraud was pervasive. The amendments were intended to create incentives for individuals with knowledge of government fraud to disclose the information without fear of reprisal or government inaction, and to encourage the private bar to commit resources to prosecute fraud on the government's behalf. The False Claims Act was further amended in May of 2009 by the Fraud Enforcement Recovery Act and again in March of 2010 by the Patent Protection and Affordable Care Act. Both of those Acts made a number of procedural and substantive changes in the FCA in an attempt to ease the government and private Realtor's burdens of investigating and prosecuting Qui Tam suits under the FCA.

## II.   NATURE OF THE ACTION

8.   Relator brings this action on behalf of the United States against the Defendant, MHS, for violations of the False Claims Act, 31 U.S.C. §3729 et seq. This action seeks to recover damages and penalties against Defendant for fraudulently submitting or causing to be submitted false claims to Medicaid/Medicare by seeking reimbursement for laboratory testing through false representations, including that such testing was performed in knowing violation of the Clinical Laboratory Improvement Amendments (CLIA) regulations and that such testing was knowingly improperly coded for reimbursement as COVID-19 testing without proper authorization. This action also seeks damages stemming from Defendant's retaliatory action against Relator for investigating and raising concerns about the violations discussed herein.

### III.    **THE PARTIES**

#### A.    **Plaintiff/Relator Michael Wicker**

9.    Michael Wicker is a resident of Pennsylvania and a citizen of the United States. Mr. Wicker was employed by MHS Labs from April 13, 2020 to April 28, 2020 as a specimen processor.

#### B.    **Defendant MHS**

10.    Med Health Services Management, L.P. is a Limited Partnership registered in Pennsylvania.

11.    Med Health Services Management, L.P., d/b/a MHS Labs ("MHS") is a CLIA certified testing laboratory located at 200 James Place in Monroeville, Pennsylvania, 15146.

12.    MHS is also accredited by the College of American Pathologists (CAP).

### IV.    **APPLICABLE LAW**

#### A.    **The Federal False Claims Act**

13.    The federal False Claims Act provides that any person who (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspires to commit a violation of (1) or (2) is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. §3729(a)(1)(A), (B) and (C).

14.   The terms "knowing" and "knowingly" under this section mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. No proof of specific intent to defraud is required. 31 U.S.C. §3729(b)(1).

15.   The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Governments behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

16.   "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

17.   Further, "[a]ny employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . or associated others in furtherance of an action under [31 U.S.C. § 3730] or other efforts to stop 1 or more violations of this [False Claims Act]." 31 U.S.C. § 3730(h)(1).

18.    "Relief [for unlawful retaliation] . . . shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees."  Id. at § 3730(h)(2).

## V.    BACKGROUND

### A.    Medicaid Program

19.    Medicaid was created in 1965 to aid states in furnishing medical assistance to eligible persons.  Medicaid is a joint federal and state assistance program. Each state administers its own Medicaid program.  Funding for Medicaid is shared between the federal government and the state governments that choose to participate in the program.

20.    Federal support for Medicaid is significant. Each state's federal funding is determined by its Federal Medical Assistance Percentage (FMAP), which is set annually and is based on per capita income compared to the national average.

21.    Similar to Medicare, a claim under the Medicaid program is reimbursable only when it is reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.  42 C.F.R. §402.3.

### B.    Medicare Program Background and Requirements

22.    In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare program to provide health insurance for the elderly and disabled. 42 U.S.C. §§1395 et seq.  Medicare is a health insurance program for: people aged 65 or older; people

under the age of 65 with certain disabilities; and people of all ages with end-stage renal disease.

23.   The Medicare Program is a federally funded and operated program.  Medicare is administered by the United States Department of Health and Human Services (HHS) through the Centers for Medicare and Medicaid Services (CMS), a department of HHS. Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the federal government.

24.   Medicare has four primary parts: Part A- hospital insurance; Part B- medical insurance; Part C- Medicare advantage managed care; and Part D- prescription drugs.

25.   Medicare Part B covers non-institutional care that includes, among other things, medical testing by clinical laboratories, where those services are reasonable and necessary to diagnose or treat medical conditions and that meet accepted standards of medical practice.

### C.   COVID-19 Testing Under Medicare Part B

26.   COVID-19 testing falls within the purview of Medicare Part B. There are several different laboratory tests available to assess whether an individual has the novel coronavirus disease 2019, commonly referred to as "COVID- 19" (collectively referred to herein as a "Coronavirus Test"). In general, Medicare reimburses healthcare providers approximately $100 for each qualifying Coronavirus Test.

27.   Medicare covers laboratory services and other diagnostic tests when (1) The treating physician or a qualified non-physician practitioner orders the tests; (2) the services are medically reasonable and necessary; and (3) the services meet all CLIA regulations.

28.   Since the beginning of the COVID-19 Public Health Emergency, the government issued temporary regulatory waivers and new rules to equip the American healthcare system with maximum flexibility to respond to the pandemic.

29.   Currently, Medicare no longer requires an order from a treating physician or nonphysician practitioner as a condition of Medicare coverage of COVID-19 and other related diagnostic laboratory testing.

30.   However, CLIA regulations are still in effect.   The Centers for Medicare and Medicaid Services (CMS) does not have the authority to grant waivers or exceptions of CLIA requirements even during a public health emergency like the COVID-19 pandemic.

**D.     Clinical Laboratory Improvement Amendments (CLIA)**

31.     The Centers for Medicare & Medicaid Services (CMS) regulates all laboratory testing (except research) performed on humans in the U.S. through the Clinical Laboratory Improvement Amendments (CLIA).

32.     CLIA was enacted in 1988 to establish quality standards, strengthen Federal oversight of clinical laboratories, and ensure the accuracy and reliability of patient test results.

33.     The Division of Clinical Laboratory Improvement & Quality, within the Quality, Safety & Oversight Group, under the Center for Clinical Standards and Quality (CCSQ) has the responsibility for implementing the CLIA Program.

34.     CLIA applies to all laboratories that examine "materials derived from the human body for the purpose of providing information for the diagnosis, prevention, or

treatment of any disease or impairment of, or the assessment of the health of, human beings." (42 U.S.C. § 263a(a)).

35.    Clinical laboratories must be CLIA certified in order to receive Medicare payments, a process which includes sworn representations that the lab is operating in accordance with CLIA rules and regulations. *See, e.g.,* 42 C.F.R. §§493.55, 493.57, 493.61, 493.63 (Subpart D).

36.    Under Medicare regulations, even a CLIA certified lab may not bill for particular tests if those tests were not performed consistent with CLIA requirements.

37.    The Lab Director, for example, must ensure that lab results are reported only when quality control is being maintained to assure the quality of laboratory services. *See, e.g.,* 42 C.F.R. §493.1407.

38.    CLIA's comprehensive quality requirements are intended to ensure safe and reliable lab testing in medical laboratories across the United States. Medical providers are prohibited from seeking payments from Medicare and Medicaid for laboratory services that are provided in violation of those quality requirements. When medical providers perform laboratory testing in knowing violation of CLIA but nevertheless seek payments from Medicare or Medicaid for those lab tests, as Defendant did, they are liable under the False Claims Act.

## VI.    FRAUD ALLEGATIONS BY RELATOR

39.    Beginning at least as early as April 2020, and continuing until the present, MHS knowingly and fraudulently submitted false claims to Medicaid/Medicare by seeking government reimbursement for laboratory testing through false representations, including

that such testing was performed in knowing violation of CLIA regulations and that such testing was knowingly improperly coded for reimbursement as COVID-19 testing without proper authorization.

40.   MHS knowingly participated in this fraudulent scheme and submitted numerous false claims to the government in an effort to boost corporate revenue.

41.   As a result of the gross violations in the lab, described below, Defendant MHS received payments for laboratory services that placed patients' lives at risk. Defendant MHS knew of the violations, but nevertheless knowingly submitted false claims to Medicaid/Medicare for lab tests performed in violation of CLIA regulations and for lab tests improperly coded for reimbursement as a COVID-19 test, which resulted in payment by the government of reimbursements for ineligible lab services.

### A.   Specimen Acceptance Without Two Patient Identifiers

42.   Relator observed numerous errors in lab procedures, including but not limited to errors in specimen acceptance.

43.   Relator observed Defendant routinely accept specimens that did not meet the standard qualifications of specimen identification required by CLIA.

44.   Standard test requests must include the patient's name or unique patient identifiers as well as the sex and age or date of birth of the patient. *See* 42 C.F.R. §493.1241.

45.   Identifying patients accurately and matching the patient with the correct treatment is a critical factor of patient safety.  As such, laboratories must ensure unique patient identifiers exist on each sample.

9

46. By way of example, Brighton Rehabilitation and Wellness Center (hereinafter "Brighton") is a for-profit nursing home located in Beaver, Pennsylvania. Brighton is the fourth largest nursing home in Pennsylvania with 589 available beds.

47. According to public media accounts, during the COVID-19 pandemic, the virus ripped through Brighton and infected hundreds of residents in a very short period of time. In fact, Brighton had the worst COVID-19 outbreak in the entire state of Pennsylvania, and the National Guard was deployed to help fight the outbreak at Brighton. As of June 11, 2020, COVID-19 infected 332 Brighton residents, resulting in the death of 80 people. In addition, approximately 104 Brighton staff members also tested positive for the virus.

48. In numerous instances, and as a regular practice, MHS would accept specimens from Brighton for testing that did not have two patient identifiers as required by CLIA standards. *See, e.g.,* 42 C.F.R. § 493.1241.

49. Samples from Brighton frequently contained only one patient identifier, and often times that one identifier was incomplete or unclear. For example, Brighton samples would include only the last name of a patient for identifying purposes; no other identifying information was contained on the Brighton samples.

50. On another occasion, a box of samples arrived for testing with only the last four digits of the patient's social security number on the sample. No other identifying factors were included with the samples.

51. MHS's regular practice of accepting specimens in violation of CLIA regulations increased the danger to patients of incorrect diagnoses and treatment.

52.   MHS knowingly ran testing on specimens that violated CLIA regulations in an effort to increase reimbursements from the government and boost corporate revenue.

53.   The violations Relator observed included lab testing on nasopharyngeal swabs for COVID-19.

54.   In numerous instances, and as a regular practice, MHS would accept nasopharyngeal swab specimens for testing that did not have two patient identifiers as required by CLIA standards. *See, e.g.,* 42 C.F.R. § 493.1241.

55.   MHS's regular practice of accepting specimens in violation of CLIA regulations increased the danger to patients of incorrect diagnoses and treatment.

56.   MHS knowingly ran testing on specimens that violated CLIA regulations in an effort to increase reimbursements from the government and boost corporate revenue.

**B.    Default Coding to COVID-19 Testing**

57.   Relator observed numerous errors in lab procedures, including but not limited to defaulting to coding for COVID-19 testing using codes U0001 and U0002.

58.   In addition to patient identifiers, standard test requests must include the test to be performed. *See* 42 C.F.R. §493.1241.

59.   Relator observed Defendant routinely default to codes U0001 and U0002 for COVID-19 testing where no test code had been specified on the request.

60.   In numerous instances, and as a regular practice, MHS would default to COVID-19 testing for nasopharyngeal swabs that were not labeled for COVID-19 testing.

61.   By way of example, MHS would direct employees to default to COVID-19 testing for nasopharyngeal swabs from Brighton that were not labeled for COVID-19 testing.

62.   Nasopharyngeal swabs can be used to detect many diseases, including but not limited to COVID-19, influenza, whooping cough and pneumonia.

63.   MHS management specifically told Relator to default to a COVID-19 test if a nasopharyngeal swab came into MHS Labs without a diagnosis code on the specimen.

64.   MHS knowingly defaulted to testing for COVID-19 on specimens without a COVID-19 diagnosis code in violation of laboratory regulations in an effort to increase reimbursements from the government and boost corporate revenue.

### C.   **Failure to Train and Document Training**

65.   Under CLIA, the laboratory director is responsible for maintaining the procedure manual, as well as ensuring the overall operation and administration of the laboratory. The Director is responsible for establishing and following written policies and procedures set forth in a procedure manual to ensure accurate and reliable results, as well as ensuring training has occurred and that staff has been provided the proper manuals. *See e.g.*, 42 C.F.R. §§ 493.1105, 1239, 1407, 1251, and 1359.

66.   For each test procedure, the procedure manual must include requirements for patient preparation, specimen collection, storage, preservation, transportation, and processing, as well as step-by-step instructions for performing the procedure and interpreting the results. *See* 42 C.F.R. § 493.1251.

67.   MHS Labs failed to provide employees with procedure manuals. No procedure manuals were available to employees at MHS Labs.

68.   CLIA rules also set forth minimum qualifications for lab personnel performing the testing, including documentation of their qualifications, training, and competence for specific types of lab testing. *See, e.g.*, 42 C.F.R. § 493.1423, 1489.

69.   Defendant failed to keep documentation of personnel's qualifications to satisfy CLIA.

70.   Defendant failed to train lab personnel to ensure that they had the skills to perform each lab procedure and knowledge of all of the quality control testing associated with each lab procedure they performed, and further failed to maintain documentation of such competency training.

71.   Relator was given only 45 minutes of training limited to ethics, false claims, HIPAA, general standards of conduct, stark law, and employment benefits.

72.   Relator was never given any type of training by MHS to ensure that Relator could perform each type of lab test for which Relator was responsible, nor did Relator receive any training or instruction on quality control procedures applicable to MHS Labs.

73.   Defendant knew about the lack of training and manuals, yet continued to operate and bill Medicaid/Medicare.

**D.      Failure to Provide Appropriate Supervision**

74.   The CLIA regulations include general requirements concerning personnel and policies, including the requirement that a laboratory employ a lab director responsible for overseeing all lab testing and lab personnel that meet certain educational and work experience standards. *See* 42 C.F.R. §§ 493.1351-1495.

75. CLIA rules require that a lab have a Director responsible for providing overall management and direction of the lab and ensuring that testing systems are developed for each type of lab test performed to ensure accurate and reliable results. This includes reviewing and signing off on procedure manuals that set forth lab procedures and quality control testing. *See, e.g.,* 42 C.F.R. §§ 493.1405, 1407, 1443, 1445.

76. In a lab conducting complex testing such as MHS, the Director overseeing the lab must be a medical doctor and have certification in pathology or experience in a clinical laboratory. *See, e.g.,* 42 C.F.R. §§ 493.1405, 1407, 1443, 1445.

77. Defendant allowed CEO Ravitej Reddy to oversee the lab and make decisions about laboratory procedures.

78. For example, CEO Ravitej Reddy directed employees that "[f]or COVID/Respiratory Panel swab samples the patient's First Name & Last Name without DOB is acceptable."

79. However, Mr. Reddy is not a medical doctor and therefore was not qualified to make decisions regarding laboratory procedure.

## VII.   CLAIMS

### A.   Submission of False Claims

80. On information and belief, COVID-19 testing performed at MHS was predominantly billed to Medicare and Medicaid.

81. MHS had actual knowledge of the insurance status of its customers, including whether the customer was a Medicaid or Medicare patient, and by either direct billing to the insured, or billing the customer, MHS submitted or caused to be submitted false claims.

82.   Beginning at least as early as April 2020, and continuing until the present, MHS knowingly and fraudulently submitted false claims to Medicaid/Medicare by seeking government reimbursement for laboratory testing through false representations, including that such testing was performed in knowing violation of CLIA regulations and that such testing was knowingly improperly coded for reimbursement as COVID-19 testing without proper authorization.

83.   Defendant MHS knowingly submitted false claims to Medicaid/Medicare for lab tests performed in violation of CLIA regulations and for lab tests improperly coded for reimbursement as a COVID-19 test, which resulted in payment by the government of reimbursements for ineligible lab services.

84.   MHS knowingly participated in this fraudulent scheme and submitted numerous false claims to the government in an effort to boost corporate revenue.

**B.     Scienter**

85.   At all relevant times, MHS acted knowingly-- that is, with actual knowledge, in deliberate ignorance, or with reckless disregard-- with respect to the fact that it was submitting false claims to Medicaid and Medicare as alleged here, and that it was making false records or statements material to false claims or to get claims paid.

86.   At all relevant times, MHS was familiar with laboratory requirements, as evidenced, among other things, by their status as a CLIA-certified laboratory and as by their CAP accreditation status.

**C.**   **Materiality**

87.   The misrepresentations made to the government as described above were material as they had a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. *See* 31 U.S.C. §3729 (b).

88.   The fact that the Medicaid and Medicare claims at issue here were not permissible was material to the government's decision whether to pay those claims.

89.   In numerous instances, and as a regular practice, MHS would accept nasopharyngeal swab specimens for testing that did not have two patient identifiers as required by CLIA standards. *See, e.g.*, 42 C.F.R. § 493.1241.

90.   The comprehensive quality requirements set forth by CLIA and CAP are intended to ensure safe and reliable lab testing in medical laboratories across the United States.

91.   Medical providers are prohibited from seeking payments from Medicare and Medicaid for laboratory services that are provided in violation of those quality requirements.

92.   When medical providers perform laboratory testing in knowing violation of laboratory standards but nevertheless seek payments from Medicare or Medicaid for those lab tests, as Defendant did, these misrepresentations are material and Defendant is liable under the False Claims Act.

93.   Defendant also knowingly improperly coded samples for COVID-19 testing.

94.   In numerous instances, and as a regular practice, MHS would default to COVID-19 testing for nasopharyngeal swabs that were not labeled for COVID-19 testing.

95. When medical providers seek payments from Medicaid and Medicare for lab tests performed with deliberately falsified codes, as Defendant did, these misrepresentations are material and Defendant is liable under the False Claims Act.

96. At all relevant times, MHS was familiar with laboratory requirements, as evidenced, among other things, by their status as a CLIA-certified laboratory and as by their CAP accreditation status.

## VIII. <u>RETALIATION</u>

97. On or about April 17, 2020, Relator disclosed specific concerns about the COVID-19 testing taking place at MHS to MHS CEO Ravitej Reddy, MHS VP of Operations Richard Balazs, and MHS employee Sean Waters.

98. Specifically, Relator stated that he was not comfortable processing samples that did not meet accreditation guidelines or local health regulations for specimen acceptance and that the information on the samples was not suitable for testing. Relator also expressed concern about patient safety.

99. On or about April 2020, CEO Ravitej Reddy orally conveyed to Relator Reddy's belief that laws are relaxed because of the crisis.

100. Management's behavior in response to Relator's concerns was alarming, and Relator again explained to upper management that testing of these samples was unethical and against health care laws and restrictions.

101. Upper management told Relator to process the samples and did not engage with Relator further on this topic.

102.  The following day, on April 18, 2020, Relator disclosed specific concerns about COVID-19 testing and billing procedure at MHS to HR Director Jennifer Smith. Relator expressed fear of retaliation should other employees learn that Relator was making this complaint.

103.  Ms. Smith advised Relator that she would inform MHS Medical Director Dr. Nassar of Relator's concerns.

104.  On April 22, 2020, Relator again disclosed specific concerns about COVID-19 testing procedures at MHS to upper management, including MHS CEO Ravitej Reddy. Specifically, Relator expressed his concern that samples did not meet accreditation and local regulations.

105.  That same day, on April 22, 2020, Relator again contacted HR Director Jennifer Smith to inform her of the illegal practices taking place at MHS regarding COVID-19 testing.

106.  On April 28, 2020, HR Director Jennifer Smith terminated Relator, stating that the reason for Relator's termination was that upper management did not believe Relator was a good fit for the company.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
(False Claims Act: Presentation of False Claims) (31 U.S.C. § 3729 (a)(1)(A))

107.  Relator restates and incorporates by reference paragraphs 1 through and including 106 above as if fully set forth herein.

108.  The FCA imposes liability on any person who knowingly presents, or causes to be

presented, to the United States for payment or approval any false or fraudulent claims for reimbursement. 31 U.S.C. § 3729 (a)(1)(A).

109.  By virtue of the acts described above, Defendant knowingly presented, and caused to be presented, materially false and fraudulent claims for payment or approval to the United States, including claims to Medicaid and Medicare for reimbursement for laboratory services performed in knowing violation of CLIA regulations and for laboratory services that were knowingly improperly coded for reimbursement as COVID-19 testing without proper authorization.

110.  Defendant presented or caused to be presented such claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

111.  The United States, unaware of the falsity of the records, statements, and claims made or submitted by Defendant, and in reliance on the accuracy thereof, paid and continues to pay for claims that would otherwise not have been paid if the truth were known.

112.  The United States sustained damages because of Defendant's wrongful conduct.

**SECOND CAUSE OF ACTION**
(False Claims Act: Making and Using False Records and Statements to Get False Claims Paid) (31 U.S.C. § 3729(a)(1)(B))

113.  Relators restates and incorporates by reference paragraphs 1 through and including 112 above as if fully set forth herein.

114.  The FCA imposes liability on any person who knowingly makes, uses or causes to

be made or used false records or statements material to a false or fraudulent claim presented to the United States for payment or approval for reimbursement. 31 U.S.C. § 3729(a)(1)(B)).

115. By virtue of the acts described above, Defendant knowingly made, used, and caused to be made or used false records or statements– i.e., the misrepresentations made and caused to be made by Defendant when submitting the false claims for payments and the false certifications made by Defendant in submitting claims for reimbursement for laboratory services performed in knowing violation of CLIA regulations and for laboratory services that were knowingly improperly coded for reimbursement as COVID-19 testing without proper authorization– to get false or fraudulent claims paid and approved by the United States, and that were material to the United States' payment of the false claims at issue in this case.

116. Defendant's false certifications and representations were made for the purpose of getting false or fraudulent claims paid by the United States, and payment of the false or fraudulent claims by the United States was a reasonable and foreseeable consequence of Defendant's statements and actions.

117. The false certifications and representations made and caused to be made by Defendant were material to the United States' payment of the false claims.

118. Defendant made or caused such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

119.  The United States, unaware of the falsity of the records, statements, and claims made or submitted by Defendant, and in reliance on the accuracy thereof, paid and continues to pay for claims that would otherwise not have been paid if the truth were known.

120.  The United States sustained damages because of Defendant's wrongful conduct.

### THIRD CAUSE OF ACTION
(False Claims Act: Conspiracy to Submit False Claims) (31 U.S.C. § 3729(a)(1)(C))

121.  Relator restates and incorporates by reference paragraphs 1 through and including 120 above as if fully set forth herein.

122.  The FCA imposes liability on any person who conspires to violate the substantive FCA provisions. 31 U.S.C. § 3729(a)(1)(C).

123.  Acting in concert, Defendant MHS and co-conspirator CEO Ravitej Reddy conspired to commit violations of the FCA, namely violations of 31 U.S.C. (a)(1)(A) and (B).

124.  Defendant MHS and co-conspirator Ravitej Reddy entered into one or more conspiracies to present or cause to be presented false or fraudulent claims for payment or approval by the United States for laboratory services performed in knowing violation of CLIA regulations and for laboratory services that were knowingly improperly coded for reimbursement as COVID-19 testing without proper authorization.

125.  The United States, unaware of the conspiracy, and unaware of the falsity of the records, statements, and claims made or submitted by Defendant, and in reliance on the

accuracy thereof, paid and continues to pay for claims that would otherwise not have been paid if the truth were known.

126.   By virtue of the false or fraudulent claims that Defendant MHS and co-conspirator Ravitej Reddy conspired to present or caused to be presented, the United States suffered damages.

**FOURTH CAUSE OF ACTION**
(False Claims Act: Retaliation) (31 U.S.C. § 3730(h))

127.   Relator restates and incorporates by reference paragraphs 1 through and including 126 above as if fully set forth herein.

128.   Relator's actions in bringing the truth about Defendant's fraud to the attention of Relator's superiors led to the retaliatory termination of Relator.

129.   Defendant retaliated against Relator for engaging in the protected conduct referenced above.

130.   Defendant terminated Relator in retaliation for Relator's efforts to prevent one or more violations of 31 U.S.C. § 3729 et seq.

131.   As a result of the foregoing, Relator has suffered damages because Defendant violated 31 U.S.C § 3730(h).

**PRAYER FOR RELIEF**

WHEREFORE, Relator requests the following relief as to Counts I, II, III, and IV in favor of the United States of America against Defendant MHS:

1.          Judgment for violations of the False Claims Act set forth above, in an amount equal to three times the amount of damages the United

States has sustained because of Defendant's aforementioned actions, plus civil penalty of not less than Five Thousand Five Hundred Dollars ($5,500.00), but not more than Eleven Thousand Dollars ($11,000.00), for each violation, plus three times the amount of damages which the United States has sustained, pursuant to the False Claims Act 31 U.S.C. §3729(a);

2.     Reimbursement to Relator of all reasonable expenses which the court finds have necessarily been occurred, plus reasonable attorneys' fees and costs;

3.     Any other and further relief as the court deems just and proper.

## JURY TRIAL DEMAND

Relator, individually and on behalf of the United States of America, demands jury trial on all claims alleged herein.

Respectfully submitted,

Dated: August 7, 2020

*/s/ Stephen S. Stallings*
Stephen S. Stallings, Esq.
PA ID No. 205131

Kiersten H. Mallon, Esquire
PA ID No. 326813

The Law Offices of Stephen S. Stallings, Esq.
310 Grant Street, Suite 3600
Pittsburgh, PA 15219

Tel:  (412) 322-7777
Fax: (412) 322-7773
attorney@stevestallingslaw.com
kmallon@stevestallingslaw.com

Stephanie L. Solomon, Esquire
Pa. I.D. 208056
HKM EMPLOYMENT ATTORNEYS LLP
220 Grant Street, Suite 401
Pittsburgh, PA  15219
412.760.7802
ssolomon@hkm.com

*Attorneys for Relator*